IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HENRY VAUGHAN, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| JO ANNE B. BARNHART, | : | |
| Commissioner of Social Security, | : | |
| Defendant | : | No. 04-3981 |

## **REPORT AND RECOMMENDATION**

PETER B. SCUDERI
UNITED STATES MAGISTRATE JUDGE                    October        , 2005

This action was brought pursuant to 42 U.S.C. § 405(g) to review the final

decision of the Commissioner of Social Security ("Commissioner") denying the

application of Henry Vaughan ("Plaintiff") for disability insurance benefits ("DIB")

under Title II of the Social Security Act, 42 U.S.C. §§ 401-433.  The parties have filed

cross motions for summary judgment.  For the reasons set forth below, I recommend that

Plaintiff's motion for summary judgment be denied, Defendant's motion for summary

judgment be granted, and the final decision of the Commissioner be affirmed.

## I.    PROCEDURAL HISTORY

Plaintiff applied for DIB on July 31, 2002, alleging disability since December 22,

1999, due to shoulder and lower back problems.[1]  (Tr. 79-82).  Following the denial of his

---

[1]Because Petitioner filed his application for DIB benefits on July 31, 2002, the relevant
period of disability begins on July 31, 2001.  See 42 U.S.C. § 423(c)(2) (an applicant for DIB
cannot receive more than twelve (12) months of retroactive benefits prior to the date of his
application); 20 C.F.R. §§ 404.315, 404.621 (same).

application, Plaintiff requested an administrative hearing before an Administrative Law

Judge ("A.L.J."), which was held on August 11, 2003.  (Tr.  29-61).  On September 8,

2003, the A.L.J. issued a decision denying Plaintiff's claim.  (Tr.  13-24).  The Appeals

Council denied Plaintiff's request for review; therefore, the A.L.J.'s decision is the final

decision of the Commissioner.  (Tr. 5-8).  See 20 C.F.R. §§ 404.948, 404.981.  Plaintiff

then filed this action seeking judicial review of the Commissioner's final decision.

## II.   STANDARD OF REVIEW

Under the Social Security Act, a claimant is disabled if he or she is unable to

engage in "any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to . . . last for a continuous period

of not less than twelve (12) months."  42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a).

Under regulations promulgated by the Commissioner, a five- (5-) step sequential

evaluation[2] is to be utilized to evaluate disability claims.  In pressing his or her claim, the

---

[2]These steps are as follows:
First, the Commissioner considers whether the claimant is currently engaged in
substantial gainful activity.  If he is not, then the Commissioner considers in the second
step whether the claimant has a "severe impairment" that significantly limits his physical
or mental ability to perform basic work activities.  If the claimant suffers a severe
impairment, the third inquiry is whether, based on the medical evidence, the impairment
meets the criteria of the impairment listed in the "listing of impairments," . . ., which
result in a presumption of disability, or whether the claimant retains the capacity for
work.  If the impairments does not meet the criteria for a listed impairment, then the
Commissioner assesses in the fourth step whether, despite the severe impairment, the
claimant has the residual functional capacity to perform his past work.  If the claimant
cannot perform his past work, then the final step is to determine whether there is other
work in the national economy that the claimant can perform.
Sykes v. Apfel, 228 F.3d 259, 262-263 (3d Cir. 2000); see also 20 C.F.R. § 416.920(b)-(f).

burden is solely upon the claimant to prove the existence of a disability.  42 U.S.C. §

423(d)(5).  A claimant satisfies this burden by showing an inability to return to former

work.  Once a showing is made, the burden of proof shifts to the Commissioner to show

that the claimant, given his or her age, education and work experience, has the ability to

perform specific jobs that exist in the economy.  Rossi v. Califano. 602 F.2d 55, 57 (3d

Cir. 1979).

Judicial review of a final decision of the Commissioner is limited.  The District

Court is bound by the findings of the Commissioner if they are supported by substantial

evidence and decided according to correct legal standards.  Allen v. Bowen, 881 F.2d 37,

39 (3d Cir. 1989); Coria v. Heckler, 750 F.2d 245, 247 (3d Cir. 1984).  Substantial

evidence is "more than a mere scintilla," and "such a relevant evidence as a reasonable

mind might accept as adequate."  Burnett v. Apfel, 220 F.3d 112, 118 (3d Cir. 2000).

Even if the record could support a contrary conclusion, the decision of the A.L.J will not

be overturned as long as there is substantial evidence to support it.  Simmonds v. Heckler,

807 F.2d 54, 58 (3d Cir. 1986); Smith v Califano, 637 F.2d 968, 970 (3d Cir. 1981).

**III.    FACTS**

**A.    Plaintiff's Background and Witness Testimony**

Plaintiff was forty-two (42) years of age at the time of his administrative hearing.

(Tr. 35).  Plaintiff lives with his wife, their two- (2-) year old son, his seventeen- (17-)

year old stepdaughter, as well as the stepdaughter's friend.  (Tr. 35).  He graduated from

high school in 1979, attended two (2) years of college, and worked as an insulator for a construction company, beginning in June 1981.  (Tr. 36-37).  On October 4, 1999, Plaintiff sustained a work injury while standing from a stooped position and turning, when his shoulder struck a protruding pipe.[3]  (Tr. 132).  He stopped working in December 1999, after diagnostic tests revealed spine and shoulder problems.  (Tr. 36, 46, 132).

Plaintiff testified regarding his treatment history for back and shoulder pain, including separate shoulder and back surgery, physical therapy and acupuncture.  (Tr. 38-40).  He testified that he takes five (5) prescription pain medications, including Percocet, Ultran and Celebrex.  (Tr. 40).

Plaintiff testified that he cares for his toddler son when his wife is at her full time job and his seventeen- (17-) year old stepdaughter is at school, but that his stepdaughter "takes over and helps" when she gets home.  (Tr. 36-41).  He stated that he could lift up to thirty (30) pounds for short periods, as evidenced by the fact that he could lift his thirty-four (34) pound son.  (Tr. 43).  Plaintiff noted that he lifted his son "for short distances," after which he noticed pain in his spine.  (Tr. 43).  Plaintiff also estimated he could walk for up to half (1/2) a mile, sit continuously for thirty (30) to forty-five (45) minutes, and drive his car short distances.  (Tr. 49-50)

_____

[3]The record indicates that Plaintiff was also involved in an earlier automobile accident. In any event, as previously noted, the relevant period of disability in this case begins on July 31, 2001, one (1) year prior to the date that he filed his application for DIB.

B.      **Medical Evidence**[4]

Plaintiff sought medical treatment for his work-related injury beginning on

November 4, 1999.  (Tr. 543).  On November 19, 1999, an EMG found chronic right C6

and C7 radiculopathy, chronic left C7 and C8 radiculopathy, and mild ulnar and median

neuropathy across both wrists.  (Tr. 162-164).  A right shoulder MRI preformed on

December 17, 1999, found small full thickness and partial thickness tendon tearing, as

well as a ganglion cyst.  (Tr. 155).  James Lamprakos, M.D., diagnosed a supraspinatus

full thickness tear, labral tear, AC joint arthritis, and fluid in the biceps sheath.  (Tr. 146).

On December 22, 1999, Dr. Lamprokos recommended that Plaintiff stop working.  (Tr.

134).

Plaintiff sought an independent medical examination on December 30, 1999, with

Mario Arena, M.D., an orthopedic surgeon.  (Tr. 121).  Dr. Arena diagnosed Plaintiff

with a contusion of the right shoulder and rotator cuff tendonitis, and recommended

steroid injections and further tests.  (Tr. 122-123).  Dr. Lamprakos referred Plaintiff to

Donald F. Leatherwood, M.D., an orthopedist.  On January 19, 2000, Dr. Leatherwood

found that Plaintiff exhibited slightly diminished rotation strength, markedly positive

impingement, and point tenderness.  (Tr. 207).  Dr. Leatherwood injected Plaintiff's

shoulder on two (2) occasions, but after Plaintiff obtained no relief, the doctor preformed

arthroscopic surgery on the shoulder on February 17, 2000.  (Tr. 205, 124).  After the

---

[4]Although the relevant period of disability in this case begins on July 31, 2001, medical
evidence from before that date is discussed for purposes of context.

sutures were removed on March 6, 2000, Dr. Leatherwood prescribed Flexeril for Plaintiff in response to his reports of pain and trouble sleeping. (Tr. 199).

From March 20, 2000, through August 16, 2000, Dr. Leatherwood treated Plaintiff six (6) additional times. The doctor noted that Plaintiff had difficulty getting up from a seated position, experienced pain when doing straight leg raises, and had some palpable tenderness associated with right-side sciatic problems. (Tr. 131, 145, 197). On August 16, 2000, Dr. Leatherwood performed trigger point injections and recommended a lower back MRI. On August 23, 2000, both a lumbar spine MRI and x-ray showed multilevel degenerative changes and disk narrowing – particularly at L3-4, L4-5, and L5-S1 – as well as prominent disc herniation at L4-5. (Tr. 153).

Dr. Leatherwood referred Plaintiff to Gerald Williams, M.D., an orthopedic surgeon, who diagnosed Plaintiff with shoulder pain of unknown etiology, a scapular cyst, recurrent labral tear, and possible rotator cuff tendinitis. (Tr. 153). On September 14, 2000, Plaintiff underwent an additional MRI on his shoulder which found moderate to severe tendonitis, a tear involving the biceps muscles, and a labral recess. On September 21, 2000, Dr. Williams scheduled shoulder surgery for November and recommended pain management. (Tr. 180-183, 211).

On September 27, 2000, Plaintiff saw Philip Kim, M.D., a pain management specialist, who diagnosed lumbar disc disease with evidence of L5 radiculopathy. Dr. Kim started Plaintiff on a series of epidural steroid injections. (Tr. 170-176).

On October 30, 2000, Dr. Leatherwood referred Plaintiff to a neurosurgeon for back surgery. (Tr. 254-255). Meanwhile, Plaintiff underwent his previously scheduled corrective shoulder surgery on November 8, 2000. (Tr. 177-179).

On November 30, 2000, Plaintiff met with Leonard Bruno, M.D., who diagnosed disc herniation at L4-5 with right sided L5 radiculopathy. (Tr. 255). A second MRI performed on Plaintiff's lumbar spine on December 4, 2000, showed partially extruded herniation at the L4-5 disc, a disc bulge at the L1-2, a small central protrusion at L2-3, a protrusion with mild to moderate stenosis at L3-4, and a bulge with slight impingement on the thecal sac at L5-S1. (Tr. 264-265). On January 4, 2001, Plaintiff underwent back surgery for his L4-5 herniated disc. (Tr. 184-190). At a follow up visit on February 8, 2001, Dr. Bruno stated that Plaintiff could increase activities slightly and drive short distances. (Tr. 252).

From March 2001 to May 2001, Plaintiff treated with Dr. Williams, Dr. Bruno and Dr. Leatherwood for follow-up to his surgeries and discussion of pain management for his right shoulder, low back stiffness, muscle spasm in his buttock, and absent right ankle reflexes. (Tr. 192, 250-251, 208). Plaintiff also attended physical therapy for this back and shoulder. (Tr. 215-239). On March 5, 2001, his third right shoulder MRI revealed a post surgical artifact, a small effusion in the long head of the biceps, and a small amount of fluid in the bursa. (Tr. 263). On June 14, 2001, his third lumbar spine MRI revealed, inter alia, a moderately sized left disc herniation at L4-5, compression on the left L5 nerve

7

root, a bulge and possible central protrusion of the disc at L3-4, and a small chronic central protrusion of the disc impinging on the epidural structures centrally at L5-S1. (Tr. 261-262)

On June 25, 2001 – shortly before the start of the relevant period of disability in this case – Plaintiff presented to Scott A. Rushton, M.D., an orthopedist, who found an eighty percent (80%) normal range of motion in Plaintiff's lumbar spine and a recurrent herniated disc at the L4-5 with L5 radiculpathy, for which he recommended nerve root injections. (Tr. 244). On August 14, 2001, after the nerve root injections, Dr. Rushton found that Plaintiff had normal motor strength and reflexes and no evidence of lumbar nerve root irritation. (Tr. 240).

On August 17, 2001, Plaintiff went to his family physician, William J. O'Brien, M.D., who noted that the treatment measures such as physical therapy and messages were relieving some of Plaintiff's pain. (Tr. 292). Plaintiff saw Dr. Bruno for an additional follow-up to his back surgery, at which time the doctor noted that Plaintiff had stopped his water therapy program because of problems with child care, that he received acupuncture treatments for his lower back, and that he had no complaints of numbness, tingling, or weakness in his legs. (Tr. 246). Plaintiff no longer walked with a limp, he exhibited normal motor strength and reflexes, and his bilateral leg-raising tested negative. (Tr. 246).

On November 23, 2001, Plaintiff reported to Dr. O'Brien that his lower back pain had improved with physical therapy. (Tr. 285). In describing his complaints of pain, Plaintiff stated that his "pain is aggravated by lifting greater than 20 pounds." (Tr. 285). On January 4, 2002, Dr. O'Brien found spasms in Plaintiff's cervical spine and shoulder and performed nerve stimulation and stretching techniques. (Tr. 281).

On January 24, 2002, Plaintiff's fourth lumbar spine MRI revealed "marked resolution" of his left-sided L4-5 disc herniation, as well as subtle progression of a disc abnormality at the L3-4. (Tr. 259-260). On May 23, 2002, his fourth shoulder MRI revealed that the areas studied were "within normal limits." (Tr. 258).

Nora Faynberg, M.D., preformed a consultative examination of Plaintiff on November 16, 2002. (Tr. 496). Plaintiff exhibited an inability to sit for a prolonged period of time, experienced some pain with repetitive movements of his shoulder, and had lumbar disc disease confirmed by diagnostic studies. (Tr. 497-498). Dr. Faynberg determined that Plaintiff was limited to standing or walking no more than one (1) hour, sitting no more than eight (8) hours; limited in pushing and pulling with the upper and lower extremities; and prohibited from all postural activities, reaching and handling, and from working around heights, vibration, and temperature extremes. (Tr. 499-500).

Sharon Wander, M.D., a consultative reviewing physician, assessed Plaintiff's residual functional capacity on November 25, 2002. (Tr. 503-510). Dr. Wander found that Plaintiff could occasionally lift or carry twenty (20) pounds, frequently lift or carry

ten (10) pounds, stand or walk with normal breaks for a total of six (6) hours in an eight

(8) hour day, sit with normal breaks about six (6) hours in a eight (8) hour day, and that

he was limited in pushing or pulling in the upper extremities.  (Tr. 504).  Dr. Wander

cited diagnostic evidence to support her conclusions regarding these limitations.  (Tr.

504-505).

 Plaintiff reported shoulder and back pain to Dr. O'Brien during examinations on

August 26, 2002, September 30, 2002, February 3, 2003, March 24, 2003, and May 12,

2003.  The doctor noted mild to moderate spasms in Plaintiff's cervical and lumbar spine,

as well as radicular symptoms in his legs and decreased sensations to pinpricks in both

lower extremities.  In a Residual Functional Capacity Questionnaire dated March 7, 2003,

Dr. O'Brien opined that Plaintiff could walk one to two (1-2) blocks without rest, sit for

up to thirty (30) minutes continuously, stand for fifteen (15) minutes at one time,

stand/walk less than two (2) hours in an eight (8) hour work day, and sit about two (2)

hours in a eight (8) hour work day.  (Tr. 544).  Dr. O'Brien also noted that Plaintiff could

lift up to ten (10) pounds occasionally, but never twenty (20) or more pounds.  (Tr. 545).

## C.    Vocational Expert Testimony

At Plaintiff's administrative hearing, the A.L.J. elicited testimony from a

vocational expert ("V.E.").  The A.L.J. asked the V.E. to assume an individual of

Plaintiff's age, education, and vocational background, with limitations on lifting up to

thirty (30) pounds.  (Tr. 53).  The V.E. testified that such a person could work in

"sedentary and light jobs," including packing, sorting, and cashier work.  (Tr. 53).  The

V.E. also testified during examination by Plaintiff's counsel that if the limitations

suggested by Dr. O'Brien were fully credited, Plaintiff would be able to perform some of

these jobs without exceeding the weight limitations, but the ability to sit for only two (2)

hours with regular breaks in an eight (8) hour day and stand/walk for less that two (2)

hours in an eight (8) hour day would foreclose the possibility of full-time work.  (Tr. 54-

55).

## IV.   DISCUSSION

By decision dated September 8, 2003, the A.L.J. found in relevant part:

* * * *

3.      The medical evidence establishes that [Plaintiff] has a severe
        musculoskeletal impairment, which does not meet or equal the
        criteria of any of the impairments listed in Apendix 1, Subpart
        P, Regulations No. 4.

4.      [Plaintiff's] statements concerning his impairments and their
        impact on his ability to work are not accepted to the extent
        those statements allege a level of disabling symptoms which
        exceed what the objective medical evidence and clinical finding
        could reasonable be expected to produce.

5.      [Plaintiff] retains the residual functional capacity to perform the
        exertional demands of a range of unskilled light work that
        permits him to vary his position between sit and stand and takes
        into consideration his right shoulder impairment.

6.      [Plaintiff] is unable to perform past relevant work.

*****

11

9.      Based on an exertional capacity for light work, and the
        [Plaintiff's] age, educational background and work experience,
        Section 404.1569 and Rules at 202.00, Table 2, Appendix 2,
        Subpart P, Regulations No. 4 (Rule 202.21), would direct a
        conclusion of "not disabled"

10.     Credible vocational testimony also shows [Plaintiff] would be
        capable of making a vocational adjustment to numerous light
        and unskilled jobs which can be preformed sitting or standing
        and which take into account claimants right shoulder limitation
        . . . .

                                * * * *

(Tr. 21-22).  Thus, the A.L.J. reached step five (5) of the five- (5-) step sequential

evaluation and found that Plaintiff was not disabled.  (Tr. 22).

        Plaintiff contends that the evidence of record demonstrates that he is disabled, and

that the A.L.J.'s determination at step five (5) of the sequential evaluation is not

supported by substantial evidence.  Specifically, Plaintiff argues that the A.L.J.: (1) failed

to properly evaluate the opinions of Plaintiff's treating physician; and (2) failed to

properly evaluate Plaintiff's residual functional capacity ("R.F.C.") resulting in a flawed

hypothetical to the V.E.

        A.      Evaluation of the Opinions of the Treating Physician

        Plaintiff argues that the A.L.J.'s decision at step five (5) is not supported by

substantial evidence because the A.L.J. improperly evaluated the opinions of Plaintiff's

treating physician by, inter alia, improperly weighing the medical evidence and

improperly ignoring various aspects of the record.  When evaluating the medical evidence

                                       12

of record, the A.L.J. may choose who to credit but "cannot reject evidence for no reason or for the wrong reason." Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)).  The opinions of treating physicians have greater probative value than the opinions of an examining physician. Podedworny v. Harris, 745 F.2d 210, 217 (3d Cir. 1984).  "Treating physicians' reports should be accorded great weight, especially 'when their opinions reflect expert judgement based on a continuing observation of the patient's condition over a prolonged period of time.'" Plummer, 186 F.3d at 429 (quoting Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir. 1987)); see also S.S.R. 96-2p, "Policy Interpretation Ruling: Giving Weight to Treating Source Medical Opinions" (providing for controlling weight where treating physician opinion is well-supported by medical evidence and not inconsistent with other substantial evidence in record).

In evaluating the medical evidence of record, the A.L.J. stated the following, in relevant part:

> Dr. O'Brien's records show, as of August 17, 2001, diagnoses of lumbar strain and strain, LS neuritis NOS, and lumbar disc disease.  [Plaintiff] reported getting some relief with therapy, such as massage.
>
> A further note of November 23, 2001, advised that [Plaintiff] reported pain was aggravated by lifting greater than 20 pounds (which would not be involved in jobs at the light exertional level).  A note dated February 1, 2002, indicated that lower back and shoulder pain was aggravated with lifting over 10 pounds, but not medical documentation of record accounts for this reported deterioration; and a note dated February 22, 2002, again advised that [Plaintiff] reported pain which was aggravated by more than 20 pounds of lifting.

13

[A] one-time exam by Dr. Faynberg . . . is accompanied by a very restrictive physical R.F.C. which I do not accept because it is not consistent with the record as a whole.  This is explicitly commented on by the state agency physician who reviewed the record.

* * * *

Updated records of family [physician] Dr. O'Brien are [in the Record]. Therein, a note dated March 24, 2003, states that [Plaintiff] reported back and right shoulder pain, stopped Bextra and was using Celebrex, twice a day, and getting acupuncture, which helped.  Dr. O'Brien reported that [Plaintiff] could stand and walk less than two [2] hours a day and sit for about two [2] hours a day.  He could occasionally lift up to ten [10] pounds. I do not accept this extreme restriction of [Plaintiff's] functions due lack of support on the record.

This record is notable for the fact that from the Fall of 2001 to date, when Drs. Bruno and Rushton were reporting unremarkable clinical exams, [Plaintiff's] only continued source of medical treatment has been his family physician, Dr. O'Brien.  His own reports include lifting up to 20 pounds, pain level of 2/10, and relief with outpatient modalities such as physical therapy and acupuncture; also, reliance on routine medications such as Celebrex.

* * * *

(Tr. 19) (citations to the Record omitted).

Plaintiff argues that the A.L.J. improperly gave no weight to the opinion of Dr.

O'Brien (who Plaintiff implicitly characterizes as his only treating physician) and failed

to discuss consistencies between Dr. O'Brien's evaluations and those of Dr. Faynberg,

Plaintiff's consultative examiner.  I disagree and find that the A.L.J. properly evaluated

the evidence of record.  As an initial matter, contrary to Plaintiff's implied position, Dr.

O'Brien was not Plaintiff's only treating physician during the relevant closed period.[5] Therefore, although Dr. O'Brien was Plaintiff's family physician, he is not the only treating physician for purposes of weighing the evidence of record.

In any event, I find that the A.L.J. did not completely discount Dr. O'Brien's opinions, but simply declined to give them controlling weight. For example, after discussing the medical evidence of record, the A.L.J. explicitly rejected Dr. O'Brien's March 24, 2003, assessment of Plaintiff's functional restrictions to the extent that they were "extreme" and lacked support on the record. (Tr. 19). Similarly, the A.L.J. rejected the assessments of Dr. Faynberg, a one- (1-) time examiner, because her opinions were "not consistent with the record as a whole" – an observation explicitly made by another reviewing physician. (Tr. 19). Because these physicians found limitations that are not supported by the record, the A.L.J. properly declined to give the opinions controlling weight. Plummer, 186 F.3d at 429; S.S.R. 96-2p. It follows, therefore, that although the A.L.J. did not explicitly discuss consistencies between Dr. O'Brien's evaluations and those of Dr. Faynberg, the A.L.J. properly discounted their individual assessments as inconsistent with the record as a whole. Moreover, to the extent these physicians found limitations supported by the record, such as limitations regarding Plaintiff's shoulder, the A.L.J. factored the limitations into her R.F.C. determination.

In sum, the A.L.J. evaluated the medical evidence and provided clear reasoning for

---

[5]For example, Dr. Bruno's medical records indicate that he regularly treated Plaintiff for more than one and a half (1 ½) years.

why she credited or rejected the opinions of the physicians of record.  As a result, I find

that this aspect of the A.L.J.'s decision is supported by substantial evidence.

**B.    Evaluation of Plaintiff's Residual Functional Capacity**

Plaintiff next argues that the decision of the A.L.J. is not supported by substantial

evidence because the A.L.J. improperly assessed Plaintiff's R.F.C., resulting in a flawed

hypothetical to the V.E.  "[The R.F.C.] is defined as that which an individual is still able

to do despite the limitations causes by his or her impairments."  Burnett, 220 F.3d at 121.

The  R.F.C. assessment is properly based upon all of the relevant evidence of an

individual's work-related activities.  See S.S.R. 96-8p.  Moreover, the A.L.J.  must

consider all of Plaintiff's condition revealed by the record, in combination, regardless of

their severity.  See Burnett, 220 F.3d at 122; 20 C.F.R. § 404.1545.  As a result, a

hypothetical presented to a V.E. "must reflect all of a claimant's impairments that are

supported by the record otherwise the question is deficient and the expert's answer cannot

be considered substantial evidence."  Podedworny, 745 F.2d at 217.

Plaintiff argues the hypothetical question the A.L.J. presented to the V.E. omitted

the restrictions provided by Dr. O'Brien and Dr. Faynberg.  As noted above, I find that

the A.L.J. properly rejected the extreme limitations assessed by Dr. O'Brien and Dr.

Faynberg as inconsistent with the overall medical evidence of record.  Instead, the A.L.J.

presented a hypothetical to the V.E. that incorporated the limitations supported by the

record as a whole, specifically, limitations related to Plaintiff's right shoulder and lower

back, including a sit/stand option.  For example, although Plaintiff complained of disabling pain, an MRI of his right shoulder was normal, and an MRI of his lumbar spine showed "mild" disc bulging at the L3-4 and L4-5 levels, (Tr. 258-260); Dr. Rushton found normal motor strength and reflexes in Plaintiff's legs, and negative straight leg-raising, suggesting no lumbar nerve root compression, (Tr. 240, 246); treatment notes from Dr. O'Brien consistently state that Plaintiff's pain was aggravated by lifting more than twenty (20) pounds, (Tr. 271-285); and Plaintiff received relief from his pain by conservative treatment measures such as acupuncture, massage and physical therapy, (Tr. 246, 292).

Based in part on the aforementioned evidence, I find that the A.L.J.'s hypothetical question properly incorporated only those limitations which are reasonably supported by the record.  Moreover, because the limitations set forth in the A.L.J.'s hypothetical question are supported by the record, I further find that the A.L.J. properly relied on the V.E.'s testimony that such a person could perform a range of sedentary and light work such as packing, sorting, and cashiering.  Podedworny, 745 F.2d at 217.  Therefore, I find that the A.L.J.'s opinion is supported by substantial evidence.

Accordingly, I make the following:

## R E C O M M E N D A T I O N

AND NOW, this            Day of October, 2005, it is RESPECTFULLY

RECOMMENDED that Plaintiff's motion for summary judgment be DENIED,

Defendant's motion for summary judgment be GRANTED, and the decision of the

Commissioner be AFFIRMED.

BY THE COURT:


s/Peter B. Scuderi_____
PETER B. SCUDERI
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HENRY VAUGHAN, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| JO ANNE B. BARNHART, | : | |
| Commissioner of Social Security, | : | |
| Defendant | : | No. 04-3981 |

## **ORDER**

AND NOW, this          Day of                    , 2005, upon careful

consideration of the Report and Recommendation filed by United States Magistrate Judge

Peter B. Scuderi, and upon independent review of the Cross Motions for Summary

Judgment filed by the parties, it is hereby ORDERED that:

1.     The Report and Recommendation is APPROVED and ADOPTED.

2.     Plaintiff's Motion for Summary Judgment is DENIED.

3.     Defendant's Motion for Summary Judgment is GRANTED.

4.     The decision of the Commissioner which denied disability insurance to

Plaintiff is AFFIRMED.

BY THE COURT:

_____

LOUIS H. POLLAK, J.